IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE: : No. 4:21-bk-01056-MJC
POLYMER INSTRUMENTATION :
& CONSULTING SERVICES, : Chapter 11
LTD. :
Debtor :

**DISCLOSURE STATEMENT IN SUPPORT
OF DEBTOR'S PLAN OF REORGANIZATION**

**I. INTRODUCTION**

**1.1 Introduction.**

The Debtor, Polymer Instrumentation & Consulting Services, Ltd. d/b/a Polymics

("Polymics" or "Debtor"), provides this Disclosure Statement (the "Disclosure

Statement") for the Plan of Reorganization (the "Plan") filed by it.

Any terms set forth herein, which are capitalized, and which are defined in the

Plan, shall have the same meaning as in the Plan, unless inconsistent with the Plan or

otherwise set forth in the Plan or in this Disclosure Statement.

**THIS DISCLOSURE STATEMENT IS ONLY A PROPOSAL UNTIL SUCH

TIME AS THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE

BANKRUPTCY COURT. CREDITORS AND PARTIES IN INTEREST (AS

DESIGNATED BY THE COURT) WILL HAVE AN OPPORTUNITY TO

OBJECT TO THE PROPOSED DISCLOSURE STATEMENT, AND

SOLICITATION OF THE ACCEPTANCE OF THE PLAN OF

REORGANIZATION CANNOT BE MADE UNTIL SUCH TIME AS THE**

1

PROPOSED DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT.

**1.2   Purpose of Disclosure Statement.**

As required by Section 1125 of the Bankruptcy Code, the Debtor has filed this Disclosure Statement for Court approval before circulation to holders of Claims and interests and before solicitations of acceptances of the Plan.

The purpose of this Disclosure Statement is to provide the holders of Claims in this case, and other parties in interest, with adequate information concerning the Debtor and the proposed Plan so that Claim holders can arrive at a reasonably informed decision so as to be able to exercise their right to vote on the Plan which has been filed with the Bankruptcy Court.  A copy of the Plan will accompany this Disclosure Statement after the Disclosure Statement is approved by the Court and will be sent to those creditors and parties in interest as the Court directs.  Those creditors whose Claims are not impaired (as defined in Section 1124 of the Bankruptcy Code) may not receive a copy of the Disclosure Statement and Plan.

ONLY THOSE CREDITORS WHO HAVE ALLOWED CLAIMS AND ARE ENTITLED TO VOTE ON THE PLAN UNDER THE BANKRUPTCY CODE WILL RECEIVE BALLOTS WHICH WILL ACCOMPANY THE APPROVED DISCLOSURE STATEMENT.  LATE FILED CLAIM HOLDERS MAY NOT BE PERMITTED TO VOTE ON THE PLAN.

2

## 1.3 Plan Confirmation.

The Court will set a date for the hearing on the acceptance of the Plan and its confirmation. Prior to such hearing, those creditors eligible to vote on the Plan may so vote on the Plan by filling out and mailing the ballot which accompanies the approved Disclosure Statement. Ballots should be forwarded to: Robert E. Chernicoff, Esquire, Cunningham, Chernicoff & Warshawsky P.C., P. O. Box 60457, Harrisburg, Pennsylvania 17106-0457, in accordance with the Order setting the time for the filing of ballots. Ballots must be received on or before the date fixed by the Court. Any ballots received after the deadline may not be counted unless the Court orders otherwise. Any ballot which sets forth an amount of a Claim which differs from the amount which is scheduled, or as filed in a Proof of Claim, as allowed, may, at the option of the Plan proponent (the "Debtor"), be corrected to the allowed amount (as defined in the Plan). Further, any ballot which sets forth the wrong classification may be corrected by the Plan proponent, unless the Court orders otherwise.

As a creditor, your vote is important. The Plan can be confirmed by the Court if it is accepted by the holders of two-thirds in amount and more than half in number of the Claims of each of the affected, impaired classes voting on the Plan. In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan. To be confirmed, the Plan must be accepted by at least one (1) impaired class determined without considering acceptances of insiders. If at least one (1) impaired class accepts the Plan, the Plan may be confirmed by the Court, if the Court finds, after notice, among

other items, that the Plan accords fair and equitable treatment to any class rejecting the Plan, the Plan does not discriminate unfairly and the Plan meets the requirements of Section 1129(b) of the Code, including the requirement that creditors will receive as much as they would receive in a liquidation.

In the event a class of unsecured creditors fails to accept the Plan, the Plan may not be approved by the Court unless certain requirements are met as to classes of Claims or interests junior to the class which does not accept the Plan.

In this case, the last class of Claims is the Class 6, General Unsecured Claims. The only Class junior to the Class 6 Claims would be Class 7, Equity Holder. In order for the Plan to be confirmed without resorting to the cram down provisions of Section 1129 of the Code and to comply with what is known as the Absolute Priority Rule, the Debtor must secure sufficient votes from its Class 6 general unsecured creditors to cause such Class 6 to confirm the Plan. If insufficient votes occur from Class 6 Claim holders for such Class to confirm the Plan, the Debtor has certain additional provisions of the Code by which it can secure a confirmation of the Plan, including, but not limited to, the placing of new value into the estate or exposing the equity to bidding.

In the event insufficient votes occur from the Class 6 Claim holders to confirm the Plan, the Debtor believes the Plan can nonetheless be confirmed. The Plan is a Liquidation Plan. Under the Plan, the equity holders in Class 7 do not retain their equity interest in the Debtor once all assets of the Debtor are liquidated. Thus, even if the Class 6 unsecured creditors do not vote in sufficient numbers to confirm the Plan as set forth in

Section 1129 of the Code, this Plan can be confirmed without violation of what is known as the Absolute Priority Rule.

With respect to the secured creditors in this case, even if a class of secured creditor does not vote to confirm the Plan, the cram down provisions of Section 1129(b) of the Code could be utilized to cause confirmation of the Plan.

The first secured creditor in this case, Fulton Bank, is to be paid the full amount of the value of its collateral as to its allowed secured Claim under the Plan. This payment will occur by a sale of the collateral which has been granted to Fulton Bank. Further, Fulton Bank is retaining its lien securing its Claim until such time as it is paid the full value of its collateral. Fulton Bank is therefore receiving an amount which is of the value equal to the amount of collateral held by Fulton Bank, as required by Section 1129(b) of the Code.

The same holds true for the one additional Claim holder, SEDA Council of Governments. This creditor will be paid an amount equal to the value of its allowed secured Claim. SEDA COG will retain its respective liens on its collateral until such time as they are paid the full value of such collateral.

The Debtor believes that the Plan does meet the requirements of Section 1129(b) as to its secured creditors. Thus, the Plan can be confirmed even if both secured creditors accept the Plan so long as one impaired class of Claims does accept the Plan, as described and set forth above.

Because the Plan is a Liquidation Plan, no projections are included with this Disclosure Statement.

**1.4    Disclaimers.**

NO REPRESENTATIONS CONCERNING THE DEBTOR, PARTICULARLY AS TO FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE VALUE OF ANY PROMISES TO BE MADE UNDER THE PLAN OR ANY AGREEMENTS INCORPORATED IN THE PLAN, OTHER THAN AS SET FORTH IN THIS STATEMENT, ARE AUTHORIZED BY THE DEBTOR. THE ATTORNEYS FOR THE DEBTOR MAKE NO REPRESENTATION OTHER THAN THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED, IN PART, UPON INFORMATION SUPPLIED BY THE DEBTOR AND THE DEBTOR BELIEVES SUCH INFORMATION TO BE CORRECT AT THE TIME OF THE FILING OF THIS DISCLOSURE STATEMENT. NOTHING CONTAINED HEREIN SHALL CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT WAS COMPILED. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE THE VOTES OR ACCEPTANCES OF CREDITORS WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY CREDITORS IN ARRIVING AT A DECISION, AND ANY SUCH

6

REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO THE COUNSEL FOR THE DEBTOR WHO, IN TURN, MAY DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS DEEMED APPROPRIATE. THIS DISCLOSURE STATEMENT, WHEN APPROVED BY THE COURT, IS THE ONLY APPROVED STATEMENT CONCERNING THE MATTERS AND FACTS DEALING WITH THE SOLICITATION OF ACCEPTANCES FOR THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROPONENT OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON THE DEBTOR, HOLDERS OF CLAIMS OR INTERESTS, OR THE REORGANIZED DEBTOR.

THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN IS NOT AN OFFER TO SELL SECURITIES. ALL CREDITORS AND PARTIES IN INTEREST ARE DIRECTED TO CONSULT WITH THEIR TAX ADVISORS AND NO TAX ADVICE IS INTENDED TO BE GIVEN BY THE PLAN AND DISCLOSURE STATEMENT

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document      Page 7 of 38

THE STATEMENT AND REPRESENTATIONS CONTAINED HEREIN ARE MADE SOLELY BY OR AT THE INSTANCE OF THE PLAN PROPONENT AND NO OTHER PARTY IN INTEREST IS RESPONSIBLE FOR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. THE PLAN PROPONENT DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

CERTAIN OF THE INFORMATION, BY ITS NATURE, IS FORWARD LOOKING, CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY PROVE TO BE FALSE OR INACCURATE AND CONTAINS ESTIMATES WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE EXPERIENCES. SUCH ESTIMATES AND ASSUMPTIONS ARE MADE FOR INFORMATIONAL PURPOSES ONLY AND NO REPRESENTATION OR WARRANTY IS MADE WITH RESPECT THERETO. ALL PROJECTIONS CONTAINED HEREIN WERE PREPARED BY OR AT THE REQUEST OF THE DEBTOR.

**1.5    Sources of Information.**

Financial information contained in this Disclosure Statement has not been subject to a certified audit. The Debtor has had tax returns and financial statements prepared in the past, but has not had a recent audit prepared.

8

The financial information contained in this Disclosure Statement and in any Exhibits hereto have been prepared based upon information supplied by the Debtor. The Debtor has owned its business for many years. The principal of the Debtor has many years of experience in research and development in the polymer and plastic fields. There have been valuations of the Assets in the past. The Debtor's values listed in the Schedules are based, in part, upon prior appraisals. Thus, the Debtor believes that any valuations contained in this Disclosure Statement are reasonable and accurate. Every reasonable effort has been made to present accurate figures.

Attached hereto as referenced in this Disclosure Statement are various exhibits. These exhibits include a list and schedule of Pre-Petition debts as of the Petition Date, and an amendment thereto (Exhibit "A"). While Claims have been filed which may differ in amount from those on the Schedules, the Debtor believes that the Schedules are reasonably accurate. Exhibit "A" is based upon information supplied by the Debtor. The Schedules of Pre-Petition Debt are intended to reflect amounts believed owed Pre-Petition by the Debtor. Attached hereto as Exhibit "B" is the Claims Register reflecting Claims as filed with the Court. A Bar Date Order has been entered by the Court. Thus, Claims filed after the date set by the Court for the filing of Claims may not be allowed.

The Debtor has prepared and filed with the Court a Statement of Financial Affairs, and Schedules of Liabilities and Assets, as required by the Bankruptcy Rules. The Debtor has filed monthly operating reports on a regular basis. The Statement of Financial Affairs, Schedules of Liabilities and Assets, and the monthly operating reports

9

are on file with the Clerk in charge of Bankruptcy Operations, United States Bankruptcy Court for the Middle District of Pennsylvania, 228 Walnut Street, Harrisburg, Pennsylvania 17110, or its electronic filing website, https://ecf.pamb.uscourts.gov. Further, all pleadings and Orders filed in this case are on file with the Bankruptcy Clerk at such address or online in the Court's ECF system. These documents are available for public inspection; all documents filed with the Court by the Debtor, and those attached to this Disclosure Statement, are believed to accurately reflect the Debtor's assets and liabilities at the date of filing, to the best of the Debtor's knowledge, information and belief, and the Debtor's cash receipts and expenditures since the date of filing. As set forth above, however, none of these documents have been subject to a certified audit, although the Debtor believes the information to be reasonably accurate.

## II.  BACKGROUND

**2.1  General.**

The Debtor is a Pennsylvania corporation which started business in 1994. The Debtor was formed to do processes for plastics, particularly for the oil and gas industry, as well as for defense jobs. The Debtor also develops intellectual property and holds a number of patents.

The Debtor's volume grew to approximately $10,000,000.00 per year in sales. During the Covid Pandemic, the Debtor's sales were cut by approximately $4,000,000.00 to $5,000,000.00 per year, in part because of the slowdown in the economy.

The Debtor provides product and services throughout the world, particularly in the United States and Asia. The Debtor owns a separate entity in Singapore which was a sales office and is a wholly owned subsidiary.

The Debtor's main facility is located in State College, Pennsylvania. The Debtor also has a sales office, in which it also provides a warehouse for certain products, in Texas.

**2.2    Pre-Petition Activities.**

The Debtor does approximately 40% of its business in research and development and consulting. The balance of the business is making smaller plastic components which are greatly sought in the oil and gas and airplane industries. There are approximately ten shareholders. The largest shareholder is Dr. Tim Hsu who is also the president and sole director of the Debtor.

The Debtor began to supply technology to a company known as Eternal in 2010. Eternal was to make a large investment in the Debtor but Eternal failed to make a full investment of at least $3,000,000.00 in additional funds.

A company for which Polymics used to perform manufacturing hired an employee of the Debtor for such Chinese company. It is alleged that the Chinese company then utilized certain of the processes and trade secrets including patents, of the Debtor, by obtaining such information from the employee. Ultimately, the Debtor, through affiliates or related companies, was successful in litigation in China including appeals up through the Chinese Supreme Court. However, because of the Chinese legal system, collection

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document    Page 11 of 38

and obtaining a final judgment is still ongoing.  This litigation in China could take a great deal of additional time.

After Chinese taxes and costs, the Debtor is hopeful that it ultimately can be successful in the China litigation, which may result in approximately $3,000,000.00 being paid to the Debtor.  There is no guarantee as to any collection, however.

Pre-Petition, the Debtor had approximately $5,000,000.00 per year in gross revenue.  As a result, the Debtor has experienced financial problems.  While the Debtor had been current on its payments to Fulton Bank, because of the alleged financial status of the Debtor, Fulton Bank determined to call its loan, enter judgment and had filed an action to seize the Debtor's Assets.  Payment to Fulton Bank ceased during the pre-Petition litigation with Fulton Bank.

### III.  PRE-PETITION OBLIGATIONS

Attached hereto as Exhibit "A" are Schedules D, E and F of the Bankruptcy Schedules as filed by the Debtor in this case, as amended. These Schedules set forth the secured and unsecured creditors of the Debtor, as the Debtor believes such existed as of the Chapter 11 Petition Date.

The Schedules of the Debtor, as set forth in Exhibit "A", list those creditors of the Debtor which the Debtor believes exist as of the date of the Chapter 11 Petition, together with the amounts which the Debtor believes it owed to these creditors as of the Petition date.  Exhibit "B" is a copy of the claims register setting forth claims as filed in this case.

12

The Court has been requested to set a bar date for the filing of Claims. The amounts set forth hereinafter assumes all Claims as scheduled will be allowed, unless set forth as disputed or contingent. If Creditors file any other Claims after the bar date, because the bar date is the final date by which all Claims against the Debtor had to be filed, any Claims filed after the bar date may not be allowed. The Debtor will examine all Claims as filed and the Debtor reserves the right under the Plan and under the Bankruptcy Code to object to any Claims which may be in error, including, those Claims which are duplicative or contain improper amounts of interest. A summary of the various Claims of creditors is set forth hereinafter.

## 3.1 Secured Creditors.

### 3.1.1 Fulton Bank

As of the Petition Date, Fulton Bank was the holder of a first priority security interest on the Debtor's Personal Property, except for Vehicles, and subject, however, to any purchase money security interests. Purchase money security interests may have been granted in favor of two parties on specific equipment for which such party provided the funds to purchase the equipment. The Debtor scheduled the Fulton Bank debt in the amount of $3,441,004.78. This debt may include default interest. Fulton Bank filed a Claim in the amount of $3,454,373.04.

### 3.1.2 SEDA Council of Government

SEDA COG provided two (2) loans to the Debtor to purchase certain equipment. As a result, SEDA COG was granted a purchase money security interest by the Debtor in

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document    Page 13 of 38

such equipment.  The Debtor believes the amount owed to SEDA COG is approximately $17,117.00 on each of the two (2) SEDA COG loans.

**3.2     Priority Tax Claims.**

The only priority tax claim which the Debtor listed are real estate taxes owed to the Centre County Tax Claim Bureau.  Under the Debtor's lease, the Debtor is obligated to pay the real estate taxes for the State College Facility.  The Centre County Tax Claim Bureau filed a Claim in the amount of $37,105.78.

A priority Claim was filed by the Massachusetts Department of Revenue for $200.53.  The Debtor may have done business in Massachusetts which results in this Claim.

**3.3     Unsecured Claims.**

The Debtor scheduled various unsecured Claims as owed to, for the most part, suppliers and subcontractors with some additional parties.  The total amount of scheduled unsecured Claims is $1,936,545.41.

A few creditors filed Claims which were not listed on the Bankruptcy Schedules. These are as follows:

| Creditor | Claim Amount |
|---|---|
| Euler Hermes NA Insurance Co., Agent of ENPOL, LLC | $15,664.00 |
| J.P. Morgan Chase Bank | $543.28 |
| XPO LTL Freight | $0.00 |
| T Mobile/T-Mobile USA Inc. | $1,109.97 |

Two creditors filed Claims which differ from the amount which the Debtor scheduled.    These are Morgan Lewis and Bockius which filed a Claim in the reduced

amount of $19,659.24 and West Penn Power, which filed a Claim in the amount of $6,450.51, which is slightly higher than the amount which was scheduled.

The Debtor will review all Claims. The Debtor will consider filing objections to those Claims which the Debtor believes are not proper to the extent an objection is expedient and necessary. The Debtor will also examine all Claims to determine whether they included any post-Petition interest or any other charges which are not proper.

## IV. POST-PETITION ACTIVITIES

**4.1    General.**

The Debtor filed its Petition on May 10, 2021.

When the case was filed, the Debtor filed First Day Motions which include, among other items, a request for the Use of Cash Collateral. The Debtor also filed Motions concerning Utilities and pre-Petition Payroll as well as an Application to Employ Counsel. An Objection was filed to the Cash Collateral Motion by Fulton Bank. At the hearing on the First Day Motions, the Court entered an Order allowing the Use of Cash Collateral which Order was entered on May 19, 2021.

The Court also entered Orders approving the other First Day Motions. The terms of the Cash Collateral Order was based, in part, on negotiations between the Debtor and Fulton Bank.

The Debtor filed additional Motions concerning the use of existing bank accounts, because of the Debtor's large amount of wires which are received into its existing

accounts. The Debtor also filed to allow the payment of various professionals in the case every sixty days.

The Debtor took various steps to increase its business through additional sales, hopeing to recover some of the pre-Covid business. The Debtor also caused the China Litigation to continue to proceed in the desire to cause the action to proceed with collection from the China Litigation Defendant. To date, such collection activities have not been successful.

Fulton Bank filed a Motion to Appoint a Chapter 11 Trustee. Negotiations ensued concerning such Motion and, as a result, the Debtor hired a financial advisor, Strategic Resources. Because of circumstances involving the fact that the Debtor has now determined to move towards a sale of its assets, it has determined that the financial advisor's services would not be as broad as originally intended.

There is also a Motion filed by the Debtor to assume its real estate leases and such Motion to assume the real estate leases was approved by the Court.

As set forth above, the Debtor has now determined to attempt to sell all of its various Assets and its Business. The Debtor is seeking buyers and will most likely be using an investment banker to locate possible buyers.

## V. SUMMARY OF DEBTOR'S ASSETS

**5.1     Tangible Personal Property.**

### 5.1.1   Receivables

The Debtor scheduled Receivables for approximately $690,000.00, of which $250,000.00 was believed to be collectable.

### 5.1.2   Inventory

The Debtor scheduled Inventory of having a value of $3,000,000.00. It is difficult to value the Inventory as it is specialized and can only be utilized by certain customers of the Debtor or entities performing services similar to that which the Debtor performs.

### 5.1.3   Office Furniture

The Debtor scheduled miscellaneous office furniture and equipment having a value of $40,000.00.

### 5.1.4   Machinery and Equipment

The Debtor provided a detailed list of equipment which the Debtor states has a value of approximately $879,000.00. Again, the machinery and equipment is difficult to value because of its specialized nature.

### 5.1.5   Vehicles

The Debtor scheduled three Vehicles consisting of a 2011 Acura MDX, a 2006 GMC Truck and a 2008 Toyota Truck. At the time of the filing of the Petition, the value of these Vehicles was scheduled as approximately $34,000.00.

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document    Page 17 of 38

**5.2     Intellectual Property.**

The Debtor listed various patents and trade secrets which it holds as having a value of $1,700,000.00. The Debtor has, in the past, sold patents and intellectual property to third parties. It is not certain as to the market for this Intellectual Property and as to a realistic sale value of such Assets.

**5.3     Litigation and Claims**

**5.3.1   China Litigation**

The Debtor is, through various affiliates and related companies, the beneficiary of any funds from the China Litigation. The Debtor believes it has a judgment in the amount of approximately $6,000,000.00. After payment of the costs of collection, as well as various taxes and other charges owed in China, the Debtor believes it can net approximately $3,000,000.00 from such China Litigation. However, the China Litigation has been protracted and is still being contested by the Defendant. Collection is believed to be difficult.

**5.3.2   Additional Claims**

The Debtor may have additional Claims based upon counterclaims which have been brought in the Court of Common Pleas of Centre County, Pennsylvania and as to Fulton Bank. Such Claims may have no value. Such Claims may be costly to pursue under the Plan, as part of the Claim against Fulton Bank in litigation in Centre County regarding the Fulton Bank debt is being withdrawn.

**5.4    Related Companies.**

The Debtor scheduled Polymics Singapore and Arylmax H.T. Material (China) as being 100% owned subsidiaries.  The Debtor also has a 20% interest in a company known as Composite Rod Systems.  The Debtor scheduled each of these companies as having zero value as it is believed such companies are not currently operating and have not operated for some time period.  Thus, these entities have no value.

**5.5    Miscellaneous**

The Debtor scheduled certain cash on hand and a rental security deposit for the Texas Facility.  The cash on hand varies.  As of the Petition Date, the cash on hand was approximately $73,000.00.  The security deposit is less than $5,000.00.

**VI.  SUMMARY OF THE PLAN OF REORGANIZATION**

**6.1    Introduction.**

**INCLUDED WITH THIS DISCLOSURE STATEMENT, UPON APPROVAL OF THIS STATEMENT BY THE COURT, IS A COPY OF THE PLAN OF REORGANIZATION OF THE DEBTOR, WHICH HAS BEEN FILED WITH THE BANKRUPTCY COURT.  FOLLOWING IS A BRIEF SUMMARY OF THE DEBTOR'S PLAN OF REORGANIZATION, AND CREDITORS ARE URGED TO READ THE FULL TEXT OF THE PLAN ITSELF.  WHILE THE FOLLOWING IS A SUMMARY, CREDITORS SHOULD NOT RELY UPON THE SUMMARY AS CONTAINING ALL PARTS OF SUCH PLAN.  FURTHER, OTHER PARTS OF THIS STATEMENT, INCLUDING PART IV RELATING TO**

19

POST-PETITION TRANSACTIONS, SET FORTH ADDITIONAL INFORMATION REGARDING THE PLAN. IF CONFIRMED, THE PLAN WILL BE BINDING UPON THE DEBTOR, ITS CREDITORS, ALL PARTIES IN INTEREST, AS WELL AS ALL EQUITY INTEREST HOLDERS, ALL OF WHOM ARE URGED TO CAREFULLY READ THE PLAN.

The Plan divides Claims into six (6) classes that consist of (1) expenses of administration for compensation of professionals; (2) other Administrative Claims; (3) Priority Tax Claims; (4) the allowed secured Claim of Fulton Bank; (5) the allowed secured claim of SEDA COG; and (6) the Claims of all other unsecured, non-priority Claim holders. Classes 1, 2 and 3 are unclassified and numbered and named as classes strictly for convenience purposes.

The seventh class is Class 7, the equity holders. The equity holders consist of approximately ten different parties who hold varying amounts of the stock of the Debtor. The largest shareholder is Dr. Tim Hsu who owns 33.4%. An additional large shareholder is Eternal Holdings, Inc., who owns 30%. The Debtor believes that the consideration owed for such shares of Eternal Holdings may not have been entirely paid. The remaining shareholders range from as little as 0.2% up to 7.2% of the equity interest.

The first three classes are technically unclassified Claims and will not have the opportunity to vote.

The treatment of classes of Claims and interests is as set forth hereinafter. It should be noted, however, that the terms and conditions of the Plan control notwithstanding any statement contained in this Disclosure Statement.

**6.2     Professional Administrative Claims and Administrative Claims.**

The general bankruptcy counsel to the Debtor during the Chapter 11 case and Post-Confirmation is Cunningham, Chernicoff & Warshawsky P.C. The accountant to the Debtor is Chen & Fan Accountancy. Special Counsel was also approved by the Court as Beard Law Company and Morgan Lewis & Bockius, LLP. The Financial Advisor to the Debtor is Strategic Resources.

All Professional Class 1 Administrative Claims will be paid in cash on or before the Effective Date of the Plan, or as otherwise agreed in writing by the Claimant and the Debtor. If funds are owed to professionals and approval by the Court is necessary for payment, then a sum will be escrowed in an amount sufficient to fund such sums owed to professionals.

Class 2, Administrative Claim holders will be paid in the ordinary course of business, on or before the Effective Date of the Plan, on or before the Effective Date of the Plan, and as soon as reasonably practical thereafter, or as otherwise agreed by the Claimant and the Debtor, whichever of these dates are later. Fees owed to the Office of the U.S. Trustee will be paid in the regular course by thirty (30) days after the close of each calendar quarter. After confirmation, the Debtor must prepare and file quarterly reports in the format requested by the U.S. Trustee, and serve such reports on the U.S.

21

Trustee.  The payment of the U.S. Trustee fees and the filing of the quarterly reports will continue until the case is closed, dismissed or converted, which ever occurs first.

**6.3** **Priority Taxes.**

Priority taxes are treated in Section 4.3 of the Plan.  Priority Tax Claims, contain only that portion of a Claim which is granted priority pursuant to Section 507(a) of the Code, as such Claims may exist as of the Chapter 11 Petition Date.  The Priority Tax Claims are believe to consist of past due real estate taxes and current real estate taxes to various tax claims bureaus and local taxing authorities.  All Priority Tax Claims will be paid in full on or before five (5) years from the Petition Date, together with interest at the rate of three percent (3%) per annum.  Interest will begin to accrue as of the Effective Date of the Plan on the unpaid tax balance.  All Priority Tax Claims include only Pre-Petition taxes and interest and do not include any penalties.  The penalties which are excluded from priority tax claims do not include trust fund penalties under Section 6672 of the Internal Revenue Code.

**6.4** **Fulton Bank**

**6.4.1**   As of the Petition Date, Fulton Bank had a first priority security interest in most of the Debtor's Personal Property.  Excluded from the lien are the Vehicles.  Also, excluded from the Assets upon which Fulton Bank has a first priority lien is any equipment upon which any parties have a purchase money security interest.  Prior purchase money security interests may be that of SEDA COG.

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document    Page 22 of 38

**6.4.2** After the Effective Date of the Plan, the Debtor will pay Fulton Bank regular monthly interest payments at the rate of 6% per annum on the principal balance owed to Fulton Bank. If and when the Debtor's Assets and Business are sold, Fulton Bank will receive the net proceeds from the sale of any of such Assets, to the extent that Fulton Bank has a lien on such Assets. Such payment will occur after the payment of the reasonable costs of sale, and after payment of any prior purchase money liens, as well as payment of professional fees. To the extent that there is any shortfall in payment in full as to the Fulton Bank allowed secured Claim, Fulton Bank will also receive the net proceeds from the China Litigation until such time as the Fulton Bank allowed secured Claim is paid in full, or to the extent proceeds exist.

In addition, Fulton Bank will receive the net proceeds, if any, after the sale of any collateral for which there is purchase money financing, in the event that the sale of such particular Assets bring additional funds over and above the amount owed for purchase money financing.

**6.4.3** Fulton Bank will retain its lien as exists pre-Petition, and as amended by any Cash Collateral Order, until such time as Fulton Bank is paid in full as to its allowed secured Claim, or the Assets of the Debtor are fully distributed.

**6.5.** **SEDA Council of Government**

**6.5.1** SEDA COG has a security interest in certain purchase money equipment as follows:

    a.    Vecoplan Waste Shredder, Model 1100 XL, Serial No. 13228010;

b.      Power Grinder;

c.      50mm Single Screw Extruder, Model YJ-P550, Serial No. 8861020101; and

d.      Take Up Roller, Model TR003, Seal No. 8861020101-TR.

(the foregoing are collectively the "SEDA COG Collateral")

The SEDA COG Collateral is believed to have been purchased utilizing funds provide by SEDA COG in two (2) loans and thus, SEDA COG has a purchase money security interest having priority over all other liens.  The Debtor believes approximately $17,000.00 is owed to  SEDA COG in each of the two (2) loans of SEDA COG to the Debtor.

**6.5.2**  To the extent SEDA COG has not been paid in full, SEDA COG will receive the net proceeds from the sale of any of the SEDA COG Collateral, up to the full amount of the SEDA COG then-allowed secured Claim.  Payment from the sale of any of the SEDA COG Collateral shall be applied only to the particular loan secured by the SEDA COG Collateral which has been sold.  Such payment will also occur after payment of reasonable costs of sale, professional fees and payment of any prior purchase money liens.

**6.6      General Unsecured Creditors**

**6.6.1**  The class 6 general unsecured creditors include all creditors not otherwise classified under the Plan.  These Claims include all such creditors notwithstanding the nature of the categorization of any claim by a creditor.  The Debtor cannot guaranty any particular return from the sale of the Debtor's Assets.  The Vehicles appear to be Assets

which are unsecured and, while these Vehicles may bring a small amount of funds, the funds may be utilized to pay classes 1, 2 and 3. No certainty as to any payment exists under the Plan. The Debtor hopes to be able to liquidate all of the Assets within six months, however, if not, the Debtor will extend the period of time for collection. Further, it is unknown as to whether the China Litigation will bring any proceeds. The other causes of action may not bring appreciable funds to be distributed.

    **6.6.2**  The Plan is a Liquidation Plan. Accordingly, after payment of all Class 1 Professional Administrative Costs, Class 2 Administrative Claims, and Class 3 Priority Tax Claims, Class 6 Unsecured Claim holders will receive a pro rata distribution of each such allowed unsecured Claim. Sums will be realized from the sale of the Debtor's Assets and if any proceeds remain after payment to Fulton Bank, or as to the loans secured by purchase money security interests as held by SEDA COG. Funds may be distributed to unsecured creditors from the China Litigation and on account of the sale of any other miscellaneous Assets.

    Again, no prediction as to the percentage or amount to be paid can be made. The Debtor hopes that by engaging an investment banker, it will realize a sale of its Business as a going concern which may result in some funds being available after payment of secured Claim holders.

    **6.6.3**  The Plan provides that the Disbursing Agent may make distributions on an interim basis if it determines that such can be done in an economically feasible manner. The Plan further provides that in the event distribution has not been justified, distribution

Case 4:21-bk-01056-MJC   Doc 134   Filed 03/09/22   Entered 03/09/22 17:06:31   Desc
Main Document    Page 25 of 38

under the Plan may be extended from time to time. The Plan defines the Distribution Date as the date on which the Disbursing Agent determines to make any such disbursements.

**6.6.4** Prior to any distribution from the Assets or the Business, if sufficient funds exist, the sum of $60,000.00 is to be set aside for the payment of ongoing administrative expenses, including professional fees for attorneys and accountants, costs for preparing the final interim and final tax returns, the costs of distribution and any United States Trustees fees.

**6.7     Equity Holder and Management.**

There are approximately ten shareholders in the Debtor. Under the Plan, the equity will continue whereby each of the equity holders will be nominal equity holders only until such time as all Assets of the Debtor have been liquidated so as to effectuate the terms of the Plan. Upon all Assets of the Debtor, including the Remaining Assets, being liquidated and the proceeds paid to creditors, and upon full and final distribution, the equity will be determined to be cancelled.

The Debtor will continue to be managed by Dr. Tim Hsu, who will also continue as the president and director.

**6.8     Executory Contracts.**

**6.8.1  State College Lease**. This lease was previously assumed by the Debtor. To the extent the lease has not been previously assumed, such lease is assumed as of the Effective Date of the Plan.

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document      Page 26 of 38

**6.8.2 Texas Lease**.    The Debtor has a lease of a sales office and warehouse facility at the Texas Location.  Such lease was previously assumed.  To the extent the lease has not been previously assumed, such lease is assumed as of the Effective Date of the Plan.

**6.8.3 SEDA COG.**  In the event that the SEDA COG debt is a lease, such leases are assumed subject to the provisions of Section 5.2 of the Plan.

**6.8.4 Insurance Contracts.**  Any insurance contracts which exist as of the confirmation of the Plan shall be deemed assumed until the policy terminates on its own accord under the terms of such policy.

**6.8.5 Miscellaneous.**  All miscellaneous contracts, leases for cell phones or utilities or employment contracts are to be deemed assumed as of the Effective Date of the Plan.  The Debtor does not believe there are any employment contracts.

**6.9    Means for Execution of the Plan.**

**6.9.1**  The Plan provides that the Debtor shall continue to operate unless and until all of its Assets are sold or the Final Distribution occurs.  The Debtor believes that until such time as the Assets are sold, that it will generate sufficient funds from its operations, including collection of Receivables to provide for the ongoing payments of the Debtor, including the monthly interest payments to Fulton Bank, as well as payment of post-Petition administrative Claims and following confirmation, all post-Petition costs of operation.

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document      Page 27 of 38

### 6.9.2 Litigation Proceeds.

The China Litigation proceeds, to the extent any exist, will be used to fund the Plan.

### 6.9.3 Sale.

The Debtor intends to market its Business and Assets as a going concern, possibly with the assistance of an investment banker, to attempt to gain the best value of the Business and Assets. If a buyer cannot be found, the Debtor's Assets may be sold in parts, or at an auction. The sale proceeds will be utilized to fund payments to creditors under the Plan.

### 6.9.4 Miscellaneous.
Because this is a Liquidation Plan, the Debtor has not prepared projections.

BECAUSE THE PAYMENT TO CREDITORS UNDER THE PLAN IS BASED, IN PART, UPON SALES OF ASSETS, NOT ALL PAYMENTS TO CREDITORS UNDER THE PLAN ARE CERTAIN. ANY PAYMENTS TO BE PAID UNDER THE PLAN ARE THEREFORE CONTINGENT UPON SUFFICIENT VALUE BEING REALIZED BY THE DEBTOR FROM THE SALE OF ITS ASSETS.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 7.1

BECAUSE THE TAX CONSEQUENCES TO CREDITORS AND DEBTOR ARE VARIED AND COMPLEX AND DEPEND, IN PART, ON PARTICULAR CIRCUMSTANCES AND BECAUSE NO RULING HAS BEEN REQUESTED OR

28

OBTAINED FROM THE INTERNAL REVENUE SERVICE AS TO ANY TAX ASPECTS OF THE PLAN, AND NO OPINION OF COUNSEL HAS BEEN OBTAINED WITH RESPECT THERETO, EACH Claim HOLDER AND INTEREST HOLDER IS STRONGLY URGED TO CONSULT WITH THEIR RESPECTIVE TAX ADVISOR OR ACCOUNTANT ABOUT THE POSSIBLE TAX CONSEQUENCES OF THE PLAN.  ALL CLAIM HOLDERS AND INTEREST HOLDERS SHOULD CONSIDER THE POSSIBLE FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES OF THE PLAN.  THE PLAN PROPONENTS ARE NOT MAKING ANY REPRESENTATION REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR, NOR ARE THE DEBTOR, THE COMMITTEE, OR THEIR RESPECTIVE COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

**7.2.**

The following is a general summary of certain significant federal income tax consequences of the Plan for the Debtor's creditors.  The following summary may assist the Debtor and its creditors in evaluating the effect U.S. federal income taxes may have if the Plan is consummated.  This summary does not address the federal income tax consequences to creditors whose Claims are entitled to reinstatement or payment in full in cash, or are otherwise unimpaired under the Plan.

This summary does not discuss all aspects of federal income taxation that may be relevant to creditors, particularly to creditors subject to special treatment under the federal income tax laws, such as tax-exempt entities, governmental agencies or political subdivisions, broker-dealers, mutual funds, insurance companies, small business investment companies, regulated investment companies, foreign corporations or individuals who are not citizens or residents of the United States. Except as expressly stated below, this discussion does not address any state, local or foreign tax matters.

This discussion is based upon information received from various sources and has not been audited or verified. Any material inaccuracies in the information may affect the stated conclusions regarding the tax consequences of the Plan. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.

This discussion is only an overview of significant tax issues that may change their application and results (e.g., we are not discussing the tax consequences from the distribution or liquidation of certain non-core assets). Moreover, the tax consequences of certain aspects of the Plan are uncertain because of the lack of applicable legal precedent.

Because of the complexity of the transactions contemplated by the Plan, the differences in the nature of the Claims of the various creditors, their taxpayer status and

methods of accounting and prior actions taken by creditors with respect to their Claims, the described tax consequences are subject to significant uncertainties and variations in their application. The Plan proponents have not received an opinion of counsel or a ruling from the IRS as to the consequences of the Plan and do not intend to seek a ruling from the IRS or opinion of counsel with respect thereto. There can be no assurance the treatment discussed below may be accepted by the IRS.

7.2.1 Federal Income Tax Consequences to Holders of Claims. The federal income tax consequences of the implementation of the Plan to a creditor may depend upon a number of factors, including whether the creditor is deemed to have participated in an exchange for federal income tax purposes, the type of consideration received by the creditor in exchange for its allowed Claim, and whether the creditor reports the income on the accrual basis.

In general, holders of Claims who receive cash should recognize gain or loss in an amount equal to the difference between (I) the cash received and (ii) its adjusted tax basis in the Claim.

Where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount or for the sale of inventory, and whether and to what extent the holder had previously Claimed a bad debt deduction.

Case 4:21-bk-01056-MJC    Doc 134    Filed 03/09/22    Entered 03/09/22 17:06:31    Desc
Main Document    Page 31 of 38

To the extent that any amount received by a holder of a Claim under the Plan is attributable to accrued interest not previously included in the holder's gross income, such amount should be taxable to the holder as interest income. Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest on such holder's Claim was previously included in the holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point. The extent to which the consideration received by a holder of a Claim will be attributable to accrued interest on the obligations constituting such Claim is unclear.

## VIII.  DISPUTES

**8.1    General.**

Under the Plan, the Debtor reserves the right to dispute and object to any Claim as filed.

**8.2    China Litigation.**

Under the Plan, the Debtor intends to continue to pursue the China Litigation and attempt to collect from the Defendant in such litigation.

## IX.  RISK FACTORS

**9.1**

There is no guarantee that the Debtor will be able to sell its Assets and Business for a sum sufficient to pay Fulton Bank in full or to make a substantial payment to unsecured creditors.

**9.2**

There is no guarantee that the Debtor will be successful in collecting on the China Litigation so as to be able to make an appreciable distribution to creditors.

## X. ALTERNATIVES TO THE PLAN

**10.1**

Because the Plan is essentially a liquidation of all of the Debtor's Assets with any equity, there is no alternative to the Plan per se which is believed to provide any greater benefit to the Debtor. The only alternative would be a conversion to a Chapter 7 case. The Debtor's liquidation analysis is set forth as Exhibit "C" which is attached hereto.

It should be noted that liquidation under Chapter 7 will have additional expenses, including Trustee's commissions and other such expenses.

Further, in the event of a Chapter 7 case, there may be unpaid Chapter 11 administrative costs which would be paid before any payment to unsecured creditors. Under this Plan, unpaid Chapter 11 administrative costs are to be paid before any payment to unsecured creditors.

Given the fact that the Debtor is doing an orderly liquidation as opposed to a forced liquidation, it is believed that the Plan is better option than a Chapter 7 liquidation. Generally, a forced liquidation might include auction or forced sales, and thus, results in lower sales proceeds than an orderly liquidation.

## XI.  OWNERSHIP OF DEBTOR'S ASSETS
## SUBSEQUENT TO REORGANIZATION

**11.1.**

Subsequent to the Confirmation of the Plan, the Debtor will be revested with all of its property then existing, free and clear of all liens, Claims and encumbrances, except as set forth in Articles V and XIII of the Plan.  Essentially, the liens, to the extent they exist, of Fulton Bank, SEDA COG will remain in effect until such time as each such creditor is paid in full or all Assets of the Debtor are liquidated.

Because the Debtor is liquidating all of its Assets, ultimately, there will be no Assets owned by the Debtor.

**11.2.**

Any transfer of any assets by the Debtor, after Confirmation of the Plan, including the sale of any real property of the Debtor, will constitute a transfer under the Plan, and shall not be subject to a transfer, stamp or similar tax under any law, including those laws of the Commonwealth of Pennsylvania.

**11.3.**

The Debtor's shareholders will remain as shareholders until such time as all Assets are liquidated and payments are made to creditors under this Plan.  At that point in time, the stock interest in the Debtor will be canceled and the Debtor will become defunct.

# XII.  MISCELLANEOUS PROVISIONS

**12.1.**

Under the Plan, the Debtor, his employees, or agents (including the professionals and any other professionals retained by such persons) are released from liability to any holder of a Claim for any act or omission in connection with, or arising out of the bankruptcy case of the Debtor, the formulation of the Plan, the pursuit of approval of the Disclosure Statement for the Plan, or the solicitation of votes for or confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and in all respects, each shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

As the Plan is a Liquidation Plan, pursuant to Section 1141(d)(3) of the Code, no discharge is being granted under the Plan.

Creditors are referred to Section 12.1 of the Plan, which provides for an injunction as to attempts by creditors to collect Claims from the Debtor as well as provides for certain default provisions.  Such provision as provides as follows:

> All creditors of the Debtor are limited, pursuant to Section 1141 of the Code, to the treatment provided by this Plan and the Code for all Claim holders and equity holders, including contingent and disputed Claims which are not otherwise Allowed Claims.  Further, as of the Effective Date, this Plan shall act as an injunction against and shall enjoin all holders of a debt held by a Claim holder, whether or not (i) a proof of Claim based on such

35

debt is filed or deemed filed under Section 501 of the Code; (ii) such Claim is allowed under Section 502 of the Code; or (iii) the holder of such Claim has accepted the Plan; from seeking payment of such Claim from the Debtor, other than as set forth in this Plan. The remedy for the breach of a provision of this Plan shall be an action in this Bankruptcy Court. The stay shall remain in effect as to any action against the Debtor through the Effective Date, when it is replaced by the injunction in this Section and Sections 524(a) and 1141 of the Code; and Claim holders are limited to the remedies set forth herein, under the Code and under applicable law. In the event that any Claim holder believes that a debt has not been paid as required under the Plan, such Claim holder is limited to remedies as provided under the Bankruptcy Code and applicable law.

Further, in the event of non-payment under this Plan, no default may occur until after the expiration of twenty (20) days after receipt of notice of such non-payment has been received by the Debtor and its counsel, Cunningham, Chernicoff & Warshawsky, P.C., Debtor's counsel, without cure of the non-payment. Such notice is to be forwarded to Debtor's counsel at the address set forth at the end of this Plan.

**12.2.**

This Disclosure Statement will be provided to creditors after it has been approved, after notice and a hearing, by an Order of the United States Bankruptcy Court. The Court will find, upon approving the Disclosure Statement, that the statement contains adequate information in accordance with the provisions of the Bankruptcy Code. It should be understood that the Court's approval of the Disclosure Statement in no way constitutes an endorsement of the Plan by the Court or a guaranty of the accuracy or completeness of the information.

The information contained in this Disclosure Statement, and in the Plan, is based upon information developed by the Debtor. It has not been subject to a certified audit or independent review. Accordingly, neither the Debtor nor its counsel are able to warrant or represent that the information contained herein is complete, or is without any inaccuracy, although they have reasonably endeavored to obtain and supply all material information.

It is hoped that all creditors will join in to confirm the contents of the Plan so that creditors, as well as the Debtor, will receive the maximum results from the Plan.

Debtor:
**POLYMER INSTRUMENTATION &
CONSULTING SERVICES, LTD.**


By: _____
        *Tim Hsu*
        Tim Hsu, Ph.D.

Date:    03/08/2022


**Debtor's Counsel:**

Robert E. Chernicoff, Esquire
Cunningham, Chernicoff & Warshawsky P.C.
2320 North Second Street
P. O. Box 60457
Harrisburg PA  17106-0457
(717) 238-6570